**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARY MICKALICH, and ALBERT
MICKALICH,

          Plaintiffs,                   No. 05-72276

 v.

                                  HON. MARIANNE O. BATTANI

UNITED STATES OF AMERICA,

        Defendant.

_____/

**OPINION AND ORDER**

This matter came before the Court for a bench trial on December 5, 2006, and was concluded on December 11, 2006. The Court heard testimony from Mary Mickalich, Albert Mickalich, Ellen Buecker-Katt, Ann Purdy, David Kestner, Captain Mark Butt, Jr., Lieutenant Commander Daniel Baravik, Commander Robert Monarch, Petty Officer David Scott, Dr. Paul Dennis Crossaint, Dr. John Wall, and Smith Kalita. The Court also received and reviewed the deposition testimony of Dr. John Bonina and Dr. Atukumar Patel. The Court received Joint Exhibits 1-37, and Plaintiff's Exhibits A-K.

The Court, having considered the evidence submitted and the legal arguments of the parties, enters the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

## I. INTRODUCTION AND BACKGROUND

In the Complaint, filed January 8, 2004, Plaintiffs allege that the United States breached a duty to Plaintiff when a Coast Guard pilot flew his helicopter at a low altitude over the Rochester Hills Stables during Plaintiff Mary Mickalich's riding lesson, causing her horse to bolt, and Mrs. Mickalich to fall to the ground. Albert Mickalich, Plaintiff's husband, was watching the lesson. Mary Mickalich seeks noneconomic damages and

reimbursement for the medical cost she incurred.  Albert Mickalich seeks damages for loss of consortium and negligent infliction of emotional distress.

## II. FINDINGS OF FACT

During the evening of July 24, 2003, a Coast Guard HH-65A helicopter flew an approved mission transporting Air Force Thunderbird personnel from an event held at the Handleman Sky Ranch to the Coast Guard Air Station at the Selfridge Air National Guard Base, located in Detroit, Michigan.  The helicopter took the most direct route from the ranch to its home base as determined by its onboard computer navigation equipment.  Several miles into the flight, the helicopter flew over horse stables where Plaintiff Mary Mickalich was taking an outdoor riding lesson.

On the date of the incident, Captain Mark Butt was the Commanding Officer of the Coast Guard Air Station at the Selfridge Air National Guard Base (Air Station).  He had approved the mission of using two Coast Guard helicopters to transport U.S. Air Force Thunderbird personnel to the Handleman Sky Ranch, northwest of Detroit, for a reception honoring the Tuskegee Airmen, African-American aviation heroes of World War Two.  The Handleman Sky Ranch contains a private airport with two long, grass-strip runways.  The ranch is located northeast of Oxford, Michigan, and 25.43 miles to the northwest of the Air Station.  The reception was an official event to kick off the 2003 Selfridge Air Show, which was scheduled to begin the following day.

Both Coast Guard aircraft involved in the mission were HH-65A helicopters.  The HH-65A's cruise speed is 120 knots of indicated air speed (KIAS) or 138 miles per hour. Its top speed is 165 KIAS or 190 miles per hour.   Both pilots were experienced.  Both aircrews were properly trained and qualified in the HH-65A.  Commander Robert P. Monarch was the pilot in command of CG6553; Lieutenant Commander Daniel P. Baravik piloted the CG6506.

2

The route between the Air Station and the Handleman Sky Ranch is not a typical area of operations for the Coast Guard helicopters assigned to the Air Station. Nevertheless, the flights to the Handleman Sky Ranch were uneventful.  Cdr. Monarch's helicopter departed the Air Station with four members of the U.S. Air Force Thunderbirds onboard at 5:16 p.m.  Cdr. Monarch took the four Thunderbird personnel on an airfield orientation flight around the Selfridge Air National Guard Base, where they would be performing the next day at the air show.  After this orientation flight, Cdr. Monarch's helicopter flew to the Handleman Sky Ranch.  The four passengers disembarked, and the helicopter returned to the Air Station to pick up more Thunderbird personnel.

Prior to the reception that evening, Cdr. Monarch transported four more Thunderbird personnel from the Air Station to the Handleman Sky Ranch.  At 7:05 p.m., Cdr. Monarch shut down his helicopter at the Handleman Sky Ranch, where he remained there until the reception ended.

At 5:49 p.m., Lt. Cdr. Baravik, in Coast Guard helicopter CG6506, departed the Air Station with four other Thunderbird personnel onboard and flew to the Handleman Ranch. At 6:11 p.m., Lt. Cdr. Baravik shut down his helicopter at the Handleman Sky Ranch, where he remained until the reception concluded.

The testimony regarding Mary Mickalich's riding lesson shows that she arrived at the Rochester Hills Stables (RHS) at approximately 7:00 p.m., along with her husband who came to watch the lesson.   RHS is located on a ten-acre site and consists of one building, several fenced enclosures, and a large and a small ring for riding.  The stables are located on the east side of Rochester Road, north of 32 Mile Road.  The stables are about twenty miles to the northwest of the Air Station and almost six miles to the southeast of the Handleman Sky Ranch.

The riding lesson began in the large ring at 8:00 p.m. and was scheduled to end at 9:00 p.m.  During the lesson, Mary Mickalich rode a leased horse named Calvin, which was

3

stabled at RHS.  Albert Mickalich watched his wife's riding lesson from a picnic table near the large ring.  About twenty people were present at the stables either watching or participating in riding lessons.

During the course of her riding lesson, the coast guard helicopters began the return flights to the Air Station.  Around 8:05 p.m, Cdr. Monarch left Handleman Sky Ranch with four Thunderbird personnel onboard and returned to the Air Station.  They landed at approximately 8:22 p.m., and the four Thunderbird personnel disembarked.  Cdr. Monarch then returned to the Handleman Sky Ranch, and by 8:48 p.m., Cdr. Monarch was airborne in CG6553 for the final time, en route to the Air Station with another four Thunderbird personnel onboard.  Cdr. Monarch landed his helicopter at the Air Station at 8:58 p.m.  He shut the helicopter down a couple of minutes later.

Cdr. Monarch's helicopter was not the one that flew over RHS at the time Mary Mickalich fell from her horse.  His helicopter was either on the ground at the Handleman Sky Ranch at the time the incident occurred or it was still on its way from the Air Station to the Handleman Sky Ranch, which is the opposite direction of flight to that of the incident helicopter, as observed by witnesses on the ground.

At approximately 8:30 p.m., Lt. Cdr. Baravik,, the pilot of CG6506, prepared for departure with four more Thunderbird personnel.  A Thunderbird pilot was seated next to Lt. Cdr. Baravik.  Petty Officer Dave Scott, the assigned flight mechanic, sat in his usual seat, which is located behind the front two seats.  The other three Thunderbird personnel sat in the back of the helicopter.  Before take-off, the pilot briefed the flight mechanic and the passengers regarding the flight back to the Coast Guard Air Station.  According to Lt. Cdr. Baravik, he told them that he would take off into the wind (which was from the north), make a climbing, left-hand turn, and then conduct a fly-by over the ranch property at an altitude of 150 feet above ground level (AGL) before climbing and returning to the Air Station.

4

Because the helicopter had been parked near some trees located at the northern edge of the Handleman Sky Ranch, the pilot air taxied the helicopter toward the back of the field to provide maximum clearance of the trees to the north of the property. Lt. Cdr. Baravik then turned the helicopter around and took off to the north at approximately 8:38 p.m. As the helicopter was gaining altitude over the trees, the flight mechanic noticed some horses in the field across the dirt road from the Handleman Sky Ranch. The pilot then made a climbing, left-hand turn before conducting a fly-by over the Handleman Sky Ranch property at about 150 feet AGL and at about 100 KIAS.

The parties disagree as to where and how this fly-by occurred. The Court finds that the fly-by did not affect either the helicopter's route of flight or its altitude over RHS, which is located almost six miles southeast of the ranch. The Court credits Lt. Cdr. Baravik's testimony that based on the helicopter's standard rate of climb, it reached an altitude of 1500 feet MSL less than one mile from the Handleman Sky Ranch and within one minute of completing the fly-by over that property. Given that RHS is almost six miles from the Handleman Ranch, the Court finds that the helicopter was already at its en route altitude a few miles before it flew over RHS.

Moreover, Lt. Cdr. Baravik testified that the helicopter climbed to a cruising altitude of at least 1500 feet above mean sea level (MSL), based on a reading from the barometric altimeter. The altitude above ground level is determined by subtracting the elevation of the land above sea level from the altitude on the barometric altimeter. For example, the Handleman Sky Ranch is at an elevation of 1167.2 feet above sea level, so that 1500 feet MSL is 332.8 feet AGL at the ranch. The land slopes downward from the Handleman Sky Ranch at an elevation of 1167.2 feet above sea level to the Air Station at only 579.46 feet above sea level. This means that a constant altitude of 1500 feet MSL equates to a steadily increasing altitude above ground level as the helicopter flew from the Handleman Sky Ranch to the Air Station.

5

Lt. Cdr. Baravik selected the RNAV function on the helicopter's navigation computer, which computes a direct flight path from the aircraft's current position to its destination and then displays this information to the pilot. The helicopter flew along this direct route of flight back toward the Air Station to the southeast, a route that took the helicopter directly over RHS.

Mr. Mickalich and other witnesses at RHS heard the approach of a helicopter before they saw it. Mr. Mickalich saw his wife's horse become spooked as the helicopter approached. He looked above him and saw the helicopter fly overhead at about the one o'clock position in the sky, with twelve o'clock being directly overhead. The helicopter was headed in a southeasterly direction. The helicopter flew straight and level and did not descend, turn, circle, or otherwise engage in any maneuver that was designed to endanger or harass the persons or animals on the ground. Mr. Mickalich looked back at his wife's horse and saw that it was bolting toward the other end of the large ring where other horses were standing. Mary Mickalich tried to turn the spooked horse and steer him away from the horses at the other end of the ring, though that was clearly where the horse wanted to go. The next moment, the horse gave a kick, bucked up, and threw its hind quarters slightly up in the air, causing Mary Mickalich to fall off her horse. She hit the ground feet first, then hit her side and back, before her head hit the sand. By the time she fell from her horse, the helicopter had already passed by overhead.

At 8:41 p.m., immediately after the incident occurred, the riding instructor called 911. Fifteen minutes later, at 8:56 p.m., the helicopter landed back at the Air Station.

The preponderance of the evidence establishes that the helicopter flew over RHS at or above 500 feet AGL based on the testimony of the pilot, the helicopter's onboard flight mechanic, and both Plaintiffs. Mary Mickalich confirmed at trial that she had testified under oath that "if [she] had to bet in Vegas, [she] would say [the helicopter had been at] 500 feet, approximately." Her husband's deposition testimony confirmed this estimate. From his

6

seat at the picnic table at RHS, Albert Mickalich got a good alignment of the helicopter as he watched it fly overhead.   Mr. Mickalich confirmed he had "a pretty good feel for distances and elevations" because he is a student pilot of fixed-wing aircraft and the owner and operator of a civil engineering and surveying business.  Based on that experience, he testified at his deposition that the helicopter was at "500 AGL" when it flew overhead.

At trial, Mr. Mickalich deferred to the estimate provided by the riding instructor, Ann Purdy, who estimated the incident helicopter's altitude at 400 feet, claiming she had the "best seat in the house."  Although Ms. Purdy had adequate credentials to estimate the height of the helicopter, her estimate is not credited by the Court because she had only seconds to observe the helicopter.  She saw the helicopter while it was still approaching the stables and did not look up at the helicopter again.  She estimates that from the time she saw the helicopter first until Mary Mickalich fell only three to four seconds elapsed. During this period of time her focus was on the safety of her riders and the horses, not on the helicopter.  Of that three to four seconds,  she testified she watched Mary Mickalich try to keep the horse from bolting for one to two seconds.  She also saw Mary Mickalich fall from her horse and the other horses' reactions to the helicopter's presence.  Her fleeting glimpse of the helicopter from the ground was inadequate to give weight to her assertion that the helicopter's altitude was actually 100 feet below what two other eye witnesses estimated--and at least 150 feet below the altitude the pilot recalls seeing on his BARALT.

In light of the circumstances, the Court finds Ann Purdy did not have the "best seat" in the house; Lt. Cdr. Baravik did.   He alone had instruments in front of him that provided a reading of his actual altitude, not an estimate.  Lt. Cdr. Baravik had a barometric altimeter (BARALT) and a radar altimeter (RADALT) onboard the helicopter.  As the helicopter pilots explained at trial, the RADALT measures the helicopter's altitude above the ground, whereas the BARALT measures altitude above sea level. Lt. Cmd. Baravik testified that he scanned his instruments throughout the flight as part of his continuous visual scan inside

7

and outside the cockpit.  He never saw the BARALT indicate an altitude below 1500 feet MSL from the moment he finished climbing until he began to descend near the Air Station. The helicopter's constant altitude of at least 1500 feet MSL equates to a steadily increasing altitude above ground level as the land between the Handleman Sky Ranch and the Air Station slopes downward fairly significantly.  With the elevation of RHS being 953.3 feet above sea level, the helicopter was at an altitude of at least 546.7 feet above ground level when it flew over the stables.  This altitude matches the pretrial altitude estimates of both Plaintiffs.  Further, the Court is not persuaded that Lt. Cdr. Baravik was too distracted by the  presence of the Thunderbird pilots to provide an accurate reading of his instruments.

Petty Officer Scott, who sat in the back of the helicopter during this flight, testified that the helicopter flew at a "safe altitude" at or above 500 feet.  He based this altitude estimate on his years of experience flying.  If the pilot had deviated from the norm, Petty Officer Scott would have noticed it.  He did not.

The stipulation regarding the Thunderbird pilot's recollection also supports the conclusion that the helicopter's en route altitude was not below 500 feet.  The stipulation entered into by both parties provides, in pertinent part, that "Major Mack Beckley, likely the Thunderbird pilot in the front left seat of Lieutenant Commander Baravik's helicopter, recalls the flight as boring and straight.  He does not recall the helicopter flying at an altitude below 1,000 feet above the ground while en route from" the Handleman Ranch to the Air Station. (Statement of Stipulated Facts No. 37).

Smith Kalita, a helicopter pilot expert with twenty-one years of experience and over 4,500 hours of flying time, testified that the "tolerance" for the BARALT in this particular helicopter is twenty feet.  This means that the BARALT is accurate to plus or minus twenty feet, so that the actual altitude range over RHS was between 1480 feet MSL (526.7 feet AGL) and 1520 feet MSL (566.7 feet AGL).  The helicopter was most likely flying within a slightly higher altitude range.  As Mr. Kalita explained, there had been a gradual increase

8

in atmospheric pressure since the pilot had adjusted his barometric altimeter setting a few hours before the incident. When the barometric pressure increases and the altimeter is not reset, the BARALT shows the helicopter is lower than its true altitude. This means that the helicopter was actually flying at a little higher altitude than the 1500 feet MSL depicted on the pilot's BARALT, ensuring that the altitude above the ground was correspondingly higher also.

In making this finding, the Court rejects the contemporaneous written statement of Cdr. Monarch as a basis for inferring that Lt. Cdr. Baravik was below 400 feet when he flew over the RHS. Cdr. Monarch wrote that he flew each mission at approximately "400 ft. AGL, [and that the] Altitude Hold and Heading Select Flight Director modes were utilized for the cruise flight portion of each sortie." (Pl. Ex. A). This statement, even when considered in conjunction with the eye witness accounts that the incident helicopter seemed to be lower than the other flights conducted by Cdr. Monarch, creates no inference for several reasons.

First, in contrast to the incident flight that passed directly over RHS, the earlier flights passed by some distance away, making the ground witnesses naturally believe that the closer helicopter was also the lowest. Second, the inference Plaintiffs seek is based on the faulty premise that Cdr. Monarch maintained a constant altitude of 400 feet AGL over sloping terrain by using the "altitude hold" in his helicopter. As Cdr. Monarch admitted on the witness stand, this is technically impossible. The altitude hold function is tied to the BARALT, not the RADALT, so that any time this function is selected it captures the altitude above mean sea level. The altitude hold then maintains this constant altitude above mean sea level regardless of the helicopter's actual altitude above the ground. This means that the helicopter's altitude would progressively increase over the ground automatically as it flew above the downward sloping terrain from the Handleman Sky Ranch to the Air Station. Because the terrain slopes upwards from the Air Station to the Handleman Sky Ranch, the

9

reverse is true for the flights in that direction.  Indeed, Cdr. Monarch testified that his helicopter would have crashed into the upward sloping terrain on the flights from the Air Station to the Handleman Sky Ranch had he actually done what he wrote in his statement.

Captain Butt, an experienced helicopter pilot, confirmed the impossibility of maintaining a constant AGL altitude over sloping terrain when the altitude hold has been selected.  This testimony from both Cpt. Butt and Cdr. Monarch was uncontradicted.  As a result, no reasonable inference arises that the incident helicopter flew over RHS below 400 feet AGL.

Finally, to discredit Lt. Cdr. Baravik's testimony that he flew over RHS at an altitude of at least 1500 feet MSL, Plaintiffs challenge his veracity as a witness.  The Court finds Lt. Cdr. Baravik a candid and credible witness.  Neither his written statement nor his confusion about the location of the fly-by alter this Court's finding.

Lt. Cdr. Baravik's statements regarding his altitude on this flight have never wavered. In his statement, written only one week after the accident in July 2003, he wrote that he climbed to an altitude of 1500 MSL and flew back to the Air Station.  (Pl. Ex. B).  Three and one-half years later on the witness stand at trial he testified to the same fact.  If he wrote his statement merely to exonerate his actions, he was unbelievably prescient to hit upon 1500 feet MSL as the altitude of his flight because the import of that altitude did not become evident until a survey of field elevations, conducted at the behest of Plaintiffs in January 2006, confirmed that an altitude of 1500 feet MSL corresponded to an altitude of 546 feet AGL at RHS.

The Court's assessment of Lt. Cdr. Baravick's veracity is not undermined by his statement that he had not flown in the immediate vicinity of the stables. His statement merely reflects his mistaken belief that the incident had occurred when the helicopter took off over some horses right across the dirt road from the Handleman Sky Ranch.  (Pl. Ex. B).  After he and Cdr. Monarch reviewed an aviation sectional chart the next day, it is clear

10

that is the "map" referred to in his statement.  (Trial Ex. 37; Pl. Ex. B).  Although they did not know the pinpoint location of the stables where the incident occurred, they knew the name of the facility was "Rochester Hills Stables."  They could see on the aeronautical chart that the City of Rochester Hills, where they assumed the stables were located, was located about half-way between the Handleman Ranch and the Air Station.  Consequently, Lt. Cdr. Baravik concluded that the incident had not occurred during take-off, and that en route he was "not at an altitude lower than 500 feet AGL."  (Pl. Ex. B).  He did not deny flying over the stables in his statement or at trial.  In both, he denied flying over the area below 500 feet.

Likewise, his changed testimony about where he actually conducted the low fly-by on the night of the incident is easily explained.  At his deposition, Lt. Cdr. Baravick's recollection of where he conducted the fly-by was based on his memory from the night of the incident more than two years before.  Although the pilot had been onboard a helicopter flight with counsel for the United States and with Cdr. Monarch a couple of days before the deposition, Cdr. Monarch testified that the flight's purpose was to take aerial photographs of RHS.  The purpose was not an air inspection of the Handleman Sky Ranch.

In contrast, at trial, the pilot's testimony about the exact location of the fly-by was based on his refreshed recollection of the layout, which was derived from a flight less than two months before trial.  During this flight, Lt. Cdr. Baravik flew in circles over the Handleman Sky Ranch so the expert for the United States could take numerous aerial photographs of the property from different angles.  This protracted circling over the property allowed Lt. Cdr. Baravik to see where the low fly-by  actually occurred.  There was no evidence the pre-deposition flight involved any circling over the Handleman Sky Ranch in this manner for any purpose.

For all of the foregoing reasons, Plaintiffs have failed to establish that the helicopter flew over RHS below 500 feet AGL.

11

The Court also finds that the Thunderbird pilot's manipulation of the helicopter's cyclic control for a portion of the incident flight did not contribute to or cause Mary Mickalich's fall from her horse. The Thunderbird pilot did not touch the cyclic until after the helicopter had already flown past RHS. Lt. Cdr. Baravik testified that the Thunderbird pilot definitely did not touch the cyclic in the first four minutes of the flight (8:38 p.m. to 8:42 p.m.), estimating that it probably did not occur until after the first six to eight minutes of the flight, from approximately 8:44 p.m. to 8:46 p.m. Lt. Cdr. Baravik based his testimony on his memory of all the actions he and his flight mechanic took before the Thunderbird pilot touched the cyclic. Specifically, he did not let the Thunderbird pilot touch the cyclic until after the crew had completed the trilogy known as "aviate, navigate, and communicate." The pilot took off, conducted the low fly-by, climbed to 1500 feet MSL, and then leveled off the aircraft. The pilot then "trimmed" the aircraft so that he did not need to make any further control inputs to fly the helicopter straight and level, except those minor adjustments necessary to correct for the effect of the wind. The pilot also selected the RNAV function and determined the route of flight via the helicopter's onboard computer system. Once all this had been accomplished, the flight mechanic communicated with the Coast Guard personnel at the Air Station via radio to let them know the helicopter was airborne and its estimated time of arrival. The Coast Guard radio log indicates that this call was made at 8:45 p.m., which is four minutes after the riding instructor called 911. Because the Thunderbird pilot did not touch the cyclic before 8:45 p.m., Lieutenant Commander Baravik was still manipulating all of the helicopter's controls when it flew over RHS at approximately 8:41 p.m.

Lt. Cdr. Baravik also testified that the Thunderbird pilot  began to manipulate the cyclic about fourteen miles from the Air Station. Given that the stables are located about twenty miles from the Air Station, this testimony confirms that the Thunderbird pilot began touching the cyclic control about five or six miles after the helicopter had flown past the

12

stables.  Moreover, Lt. Cdr. Baravik testified that the helicopter never descended below 1500 feet MSL.  He added that it  did ascend slightly, while the Thunderbird pilot had the cyclic, ensuring that the helicopter was at least 500 feet AGL during that portion of the flight.   For the foregoing reasons, the Thunderbird pilot issue is irrelevant to Mary Mickalich's fall.

## III.  CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), §§ 2671-80 (2000).  Under the Federal Tort Claims Act, the Court determines what substantive law controls the rights and liabilities of the parties by applying the choice-of-law rules of the jurisdiction where the government acts or omissions occurred. 28 U.S.C. § 1346(b)(1) (2000); Richards v. United States, 369 U.S. 1, 11 (1962).  Because the alleged government acts or omissions occurred within this district, Michigan choice-of-law rules apply.  Id.  Michigan choice-of-law rules will apply Michigan substantive law unless a "rational reason" to do otherwise exists.  Sutherland v. Kennington Truck Serv., Ltd., 562 N.W.2d 466, 471 (Mich. 1997).  There is no rational reason to apply the law of any other jurisdiction, given that the government acts or omissions allegedly occurred in Michigan, and both Plaintiffs reside here.  Id.  As a result, Michigan substantive law controls.

The ordinary rules of negligence apply to actions arising out of the operation of aircraft.  See, e.g., Schuler v. United States, 868 F.2d 195 (6th Cir. 1989).  Under Michigan negligence law, Plaintiffs must prove: (1) that the defendant owed a duty to plaintiffs; (2) that the defendant breached that duty; (3) that the defendant's breach of that duty was a proximate cause of the plaintiffs' damages; and (4) that the plaintiffs suffered damages. Fultz v. Union-Commerce Assocs., 683 N.W.2d 587, 590 (Mich. 2004); Sierocki v. Hieber, 425 N.W.2d 477, 478 (Mich. Ct. App. 1988).

The standard of care in a negligence case is always "reasonable conduct," the exercise of the same degree of care as a "person of reasonable prudence would exercise under the circumstances as they existed."  Buczkowski v. McKay, 490 N.W.2d 330, 332 (Mich. 1992); Antcliff v. State Employees Credit Union, 327 N.W.2d 814, 817 (Mich. 1982); Bock v. General Motors, Corp., 637 N.W.2d 825, 831 (Mich. Ct. App. 2001).

"Proximate cause is that which, in a natural and continuous sequence, unbroken by new and independent causes, produces the injury."  Wiley v. Henry Ford Cottage Hosp., 668 N.W.2d 402, 410 (Mich. Ct. App. 2003).

Lt. Cdr. Baravik complied with the applicable Federal Aviation Regulation (FAR) regarding minimum safe altitude by flying at or above 500 feet AGL over RHS.  "[F]ederal law establishes the standards of care in the field of aviation safety and thus preempts the field from state regulation." Greene v. B.F. Goodrich Avionics Sys., 409 F.3d 784, 795 (6th Cir. 2005); see Abdullah v. American Airlines, Inc., 181 F.3d 363, 367 (3d Cir. 1999) (holding same).

The FARs establish the "rules of the road" for all pilots and are evidence of the standard of care applicable to the Coast Guard helicopter pilot.  See 28 U.S.C. § 2674 (2000) ("The United States shall be liable. . .in the same manner and to the same extent as a private individual under like circumstances. . . ."); 14 C.F.R. § 91.13 ("No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another"); Campbell v. Keystone Aerial Surveys, Inc., 138 F.3d 996, 1002-03 (5th Cir. 1998) (finding that the FARs are "evidence of what a reasonable pilot would have done under the circumstances"); In re N-500L Cases, 691 F.2d 15, 28 (1st Cir. 1982) (the FARs are the rules of the road for pilots); New Hampshire Ins. Co. v. United States, 641 F. Supp. 642, 650 (D.P.R. 1986) (same); Knight v. United States, 498 F. Supp. 316, 323 (E.D. Mich. 1980) (the FARs have the force and effect of law and pilots must comply with them).

14

The FARs establish a specific standard of care regarding "[m]inimum safe altitudes" for aircraft flying over various types of land use.  14 C.F.R. § 91.119.  The applicable regulation provides:

> § 91.119 Minimum safe altitudes: General.
>
> Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:
>
> (a)     Anywhere.  An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.
>
> (b)     Over congested areas.  Over any congested area of a city, town, or settlement, or over any open air assembly of persons, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet of the aircraft.
>
> (c)     Over other than congested areas.  An altitude of 500 feet above the surface, except over open water or sparsely populated areas.  In those cases, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure.
>
> (d)     Helicopters.  Helicopters may be operated at less than the minimums prescribed in paragraph (b) or (c) of this section if the operation is conducted without hazard to persons or property on the surface.  In addition, each person operating a helicopter shall comply with any routes or altitudes specifically prescribed for helicopters by the Administrator.

14 C.F.R. § 91.119;[1] see Scott v. United States, 13 F. Supp.2d 1226, 1229-31 (M.D. Ala. 1998) (applying this FAR in the context of military aircraft overflying an exotic bird aviary).

Although this regulation allows helicopter pilots to fly below the established minima over any surface, so long as the operation is conducted without hazard to persons or

---

[1] The Michigan Aeronautics Code uses similar language to establish the benchmark standard of care for pilots at the same minimum safe altitudes over the same types of land use, with a similar exception for helicopters.  See Mich. Stat. Ann. § 259.80e (Michie 2001).  Thus, it does not matter whether federal or state law applies here regarding minimum safe altitudes because the result is the same under either sovereign's law.

property on the ground, helicopter pilots can also comply with this regulation by flying at the appropriate minimum safe altitude over the relevant land use.  The regulation establishes safe minimum altitudes for flying over the following types of land use.        The minimum safe altitude for flying over any type of land use is an altitude such that, if a power unit fails, an emergency landing can be conducted without undue hazard to persons or property on the surface.  See 14 C.F.R. § 91.119(a).  The pilot testified that his altitude over RHS would have allowed him to conduct such a maneuver safely.  His testimony was uncontradicted.

The parties dispute whether Lt. Cdr. Baravik's flight should be evaluated in light of subsection (b) or (c).  The Court finds subsection (c) governs for the reasons stated below.

The minimum safe altitude is 1,000 feet AGL for flying over a "congested area" of a city, town or settlement.  See id. § 91.119(b).  RHS is not located in a congested area of a city, town, or settlement.  The stables are located on a ten-acre site nestled among trees, with houses on large, well-treed lots in the surrounding area.  The presence of a trailer park across the nearest road and to the north of RHS does not convert the semi-pastoral environs of RHS into a "congested" area.  Capt. Butt, Cdr. Monarch, Lt. Cdr. Baravik, and Smith Kalita all testified that, based on their many thousands of hours of helicopter piloting experience, RHS is not located in what the aviation regulation terms a "congested area" of a city, town, or settlement.  The aerial photographs of the area and the AAA map presented at trial confirm this testimony.  Plaintiffs presented no expert testimony on this issue.

Although Plaintiffs offered no expert opinion that the stables were located in a "congested area," they rely on an unpublished  National Transportation and Safety Board (NTSB) decision to support their position.  Hinson v. Traub, May 27, 2994,  N.T.S.B. (attached as exhibit to Pl. Closing).  That case involved an aircraft which flew directly over a moderately busy interstate highway in California, albeit on a Saturday, for at least one-quarter of a mile at about 50-100 feet in altitude.  The NTSB found that the housing areas surrounding the interstate highway constituted a "settlement" and that the "moderate traffic

16

in every lane" of the interstate highway rendered the area "congested" for purposes of the pertinent regulation.  (Hinson at 6, 7).  The decision is unhelpful because there is no basis for determining the actual nature and extent of the housing development the Board believed constituted a settlement in Hinson.  The decision is inapposite because the presence of cars on one of California's major, congested freeways cannot be compared with the semi-pastoral environs of RHS.

The minimum safe altitude is 500 feet AGL for flying over an area that is designated as "other than congested."  Smith Kalita testified that, based on his more than twenty years of experience as an aviator, RHS and its environs fall into the regulation's middle classification between "congested areas" and "sparsely populated areas," known by the catch-all title of "other than congested."  If RHS and its environs were classified as a "congested" area as Plaintiffs urge, then this would render the classification "other than congested" meaningless and regulatory surplusage.  Cf. Claassen v. City & County of Denver, 30 P.3d 710, 713 (Colo. Ct. App. 2000) (finding that the regulatory term "sparsely populated area" would be rendered meaningless if the landowners' properties were considered a "settlement").  The aerial photographs of RHS and its location on a AAA map confirm that the proper classification for this type of land use is "other than congested."

Plaintiffs also contend that the proper altitude benchmark is 1,000 feet because a total of twenty riders and spectators on a ten-acre site constitute an "open air assembly of persons."  See 14 C.F.R. § 91.119(b).  Plaintiffs' argument fails to recognize that this phrase must be construed in light of its regulatory context within the subsection dealing with "congested areas."  Twenty people on a ten-acre site simply cannot be equated with a congested area of a city, town, or settlement.  If the phrase were to be construed as Plaintiffs suggest, then a pilot could violate this regulation by flying below 1,000 feet over a backyard barbeque.  This cannot be the intent of the regulatory language.  The only testimony at trial was to the contrary.  Smith Kalita testified that the phrase refers to crowds

17

at stadiums, outdoor concerts, and the like.  See, e.g., Barnum v. NTSB, 595 F.2d 869 (D.C. Cir. 1979) ("crowds" around a monument constituted an open air assembly of persons).

In a final effort to establish that the helicopter's altitude violated a federal regulation, Plaintiffs argue that the United States breached a provision of the Coast Guard's Air Operations Manual.  There are numerous problems with this argument.

First, Plaintiffs cite no authority for the proposition that this internal agency document constitutes a federal regulation.

Second, the manual provision Plaintiffs rely upon is inapplicable here.  The referenced section of the Air Operations Manual provides:

> Flights of Coast Guard aircraft shall cause a minimum of annoyance to persons and activities on the ground.  It is not sufficient that the pilot is satisfied that no person is actually endangered.  The pilot must exercise enough caution to be assured that no person on the ground could reasonably believe that they or their property is endangered.

(Joint Ex. 6, Coast Guard Air Operations Manual 4-54).  Capt. Butt and Smith Kalita both testified that the provision applies to Coast Guard helicopter pilots when they are flying below the altitude minima established in the FARs.  When flying above the established minima, this provision is not triggered.

Third, this manual provision does not establish the applicable standard of care the Court must apply in this case.  Under the FTCA, the United States "shall be liable . . .in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674 (2000); Huffman v. United States, 82 F.3d 703, 705 (6th Cir. 1996).  This statutory language requires that the Coast Guard pilots be held to the same standard of care as private helicopter pilots, who are not required to follow this military manual provision.  Moreover, if this manual provision heightens the standard of care for Coast Guard pilots, as Plaintiffs argue, then its application to the Coast Guard pilots in an FTCA

18

case would eviscerate the plain meaning of the FTCA's "same manner" and "same extent" language.

Finally, unlike the applicable FAR, which establishes a readily discernable standard of care regarding an aircraft's altitude, this amorphous "fly safe" instruction provides no workable standard of care. According to Plaintiffs, this manual provision is automatically violated every time a person on the ground is injured by a Coast Guard helicopter, regardless of the altitude at which it was flying. Not only is this contrary to the FARs, but it is also the language of strict liability, not negligence. Under the FTCA, this is not an acceptable result because the Act prohibits the application of strict liability in claims against the United States. Laird v. Nelms, 406 U.S. 797, 797-99 (1972) (finding, in a case involving claims of property damage from the sonic booms caused by Air Force aircraft overflights, that "the Federal Tort Claims Act itself precludes the imposition of liability if there has been no negligence or other form of misfeasance or nonfeasance"); Chancellor v. United States, 1 F.3d 438, 440 (6th Cir. 1993) (United States not strictly liable under FTCA).

The Court declines to draw an adverse inference, advocated by Plaintiffs, regarding the altitude of the helicopter based on the Coast Guard's failure to preserve the electronic data temporarily stored on the helicopter's Voice and Data Recorder (VADR). The rules applying to the spoliation of evidence and the range of appropriate sanctions are defined by state law. See Beck v. Haik, 377 F.3d 624, 641 (6th Cir. 2004); Nationwide Mut. Fire Ins. Co. v. Ford Motor Co., 174 F.3d 801, 804 (6th Cir. 1999); Beil v. Lakewood Eng'g & Mf'g Co., 15 F.3d 546, 552 (6th Cir. 1994).

Under Michigan law, an adverse inference is warranted against a party that fails "to produce evidence only when: (1) the evidence was under the party's control and could have been produced; (2) the party lacks a reasonable excuse for its failure to produce the evidence; and (3) the evidence is material, not merely cumulative, and not equally available

to the other party." Ward v. Consolidated Rail Corp., 693 N.W.2d 366, 371-72 (Mich. 2005).

At trial, the United States provided the Court with a reasonable explanation for the unavailability of this electronic data.  The Court heard the uncontradicted testimony of two witnesses who have a great deal of experience with the Coast Guard's VADR:  Capt. Butt assisted with the integration of the VADR into this model of helicopter; Smith Kalita co-authored the Coast Guard User's Guide to the VADR.  Both testified that the VADR records and temporarily stores approximately four hours of flight parameter data, including altitudes actually flown on a mission.  They also testified that access to this data is restricted and its removal and analysis is complex.  Coast Guard Air Stations do not have the capability to extract, decompress, or analyze any data stored in this type of helicopter's VADR, nor is this data preserved or downloaded on a routine basis for maintenance or training.  When data extraction is required, the Aviation Safety Division at Coast Guard headquarters in Washington, D.C. must authorize the removal of the VADR from the aircraft and then ship the unit to the U.S. Coast Guard Aircraft Repair and Supply Center in Elizabeth City, N.C., which has the capability to extract, decompress, and analyze voice and flight data stored in a VADR.

Capt. Butt and Smith Kalita testified that the purpose of the VADR is for Coast Guard safety mishap investigations.  Both testified that Mary Mickalich's accident did not satisfy the criteria for initiating a safety mishap investigation because she was a nonCoast Guard employee injured on non-Coast Guard property.  As a result, Coast Guard regulations and policy did not require the preservation of the data on the VADR.

Although the accident satisfied the criteria for the initiation of an administrative/litigation investigation, Capt. Butt testified that Coast Guard regulations and policy did not require him to preserve the data from the VADR for such investigations, and

he has never done so.  None of this testimony regarding the preservation of the VADR was contradicted.

The balance of policy considerations also weighs against imposing an adverse inference under these circumstances.  When the Coast Guard was notified of the incident, the agency did not know which of the two helicopters conducting operations that night between the Air Station and the Handleman Sky Ranch had flown over RHS at the time of the incident.  The Air Station would have had to ground both helicopters to extract the VADR, and it had only four helicopters of this type.  Grounding the helicopters would have cut the fleet in half during an air show and, more importantly, during the summertime when the services of the Coast Guard are most in demand for search and rescue.  In fact, the incident helicopter was designated as the search and rescue helicopter the next day because of its flight-ready status when compared to the other Air Station helicopters.  The incident helicopter conducted operations at the air show and launched on two search and rescue missions the day after the incident.  Because the electronic data on the VADR is automatically overwritten any time the electrical system of the helicopter is switched on, the combination of the air show and search and rescue operations erased all four hours of data previously recorded on the VADR.  Consequently, by the end of the day following the incident, all pertinent data had been overwritten automatically in the normal course of the Coast Guard's operations.  This is not only a reasonable explanation for the unavailability of the electronic data temporarily stored on the VADR, but it also demonstrates that this is not the type of agency action that warrants an adverse inference at a trial more than three years later.

The Court further declines to make an adverse inference regarding the helicopter's altitude over RHS based on the Coast Guard's routine destruction of certain maintenance records.  In July 2003, the Coast Guard completed "blue sheets," "yellow sheets," and "pink sheets" for its helicopter operations.  Only the blue sheets were retained in the Coast

21

Guard's Aviation Maintenance Management Information System (AMMIS).  No document in the AMMIS contains any data regarding the actual altitude, airspeed, or vectors flown on any mission.

Ninety days after the incident, the yellow sheet relating to the incident flight was routinely destroyed as part of the Coast Guard's document retention policy.  Approximately one year after the incident, the pink sheet relating to the incident flight was routinely destroyed as part of the Coast Guard's document retention policy.  Both the yellow sheet and the pink sheet contained information relating to maintenance issues; neither the yellow sheet nor the pink sheet contained any data of flight characteristics such as altitude, airspeed, and vectors actually flown during the mission.

Consequently, no adverse inference is warranted.  The missing maintenance documents were routinely destroyed in accordance with Coast Guard policy.  Moreover, these documents did not contain information such as the actual altitude flown for which Plaintiffs seek an adverse inference.

Further, the Court concludes that Lt. Cdr. Baravik had no duty to avoid flying over the RHS.  Smith Kalita, the only helicopter pilot expert to opine on this issue, testified that the applicable standard of care for helicopter pilots did not require Lt. Cdr. Baravik to alter his direct route of flight from the Handleman Sky Ranch to the Air Station so as to avoid flying over RHS at or above 500 feet.  No FAR or other aviation rule required such action.  The Court finds contrary testimony offer by Plaintiffs through David Kestner unpersuasive.

David Kestner, a former F-18 Marine Corps fighter pilot, is Mary Mickalich's brother.  He has never been a licensed helicopter pilot.  His testimony that he would not have flown over the stables or any home at an altitude of 500 feet in his plane, and that the Coast Guard helicopter pilot should not have done merely reflects his personal opinion.  The Court does not equate the standard of care for military jets to that of helicopters.  During cross-examination, Mr. Kestner conceded that certain questions about helicopters should

22

be addressed to Capt. Butt and Smith Kalita, witnesses he referred to as "the experts." Accordingly, the Court credits the testimony of these helicopter pilot experts over the testimony of Mr. Kestner, a jet fighter pilot, regarding where helicopters may fly and at what altitudes.

Another factor weighing against Plaintiffs' contention that the stables should have been avoided, is the absence of evidence that RHS was located in an established "noise sensitive area" or any recognized category of special use airspace that would support such an argument.  The only evidence at trial was that RHS did not fall within a "prohibited area," a "restricted area," an "alert area," a "warning area," or a "military operations area."   In short, the helicopter pilot was not required by any FAR or other universally applicable mandate to avoid flying over RHS.

Plaintiffs argue that the Coast Guard should have identified the stables as an area to avoid flying over by conducting an aerial survey of the route of flight beforehand. Because the route of flight between the Air Station and the Handleman Ranch was not a typical area of operations for these Coast Guard helicopters, the pilot would have had to conduct an aerial survey specifically for this one mission.  Smith Kalita testified that such a survey was not necessary to satisfy the standard of care for helicopter pilots.  Plaintiffs have cited no authority to support their claim that such a survey was required to comply with the standard of care for helicopter pilots, nor does it seem reasonable to require pilots to fly an aerial survey of a route between two airfields before actually making the flight. Even if the Coast Guard had flown an aerial survey of the route before the flights on July 24, 2003, there would be no guarantee the pilot would have been able to identify the property as one that provided horse riding lessons, especially if the aerial survey occurred when no riding lesson was in progress or when the horses were inside the stables.

Plaintiffs also argue that the helicopter pilot violated the Coast Guard manual by flying over RHS.  Even if the Coast Guard's Air Operations Manual established the

standard of care in an FTCA case, which it does not for the reasons set forth above, the manual does not prohibit flight over the horse stables.  The manual provides in pertinent part:

> Except for operational missions requiring otherwise, the following specific restrictions apply:
> Fur and poultry farms shall be avoided . . . .
> Resorts, including beaches, shall be avoided by [fixed-wing] aircraft by at least one mile when at an absolute altitude of less than 2000 feet and by [rotor-wing] aircraft by at least 1/4 mile when at an absolute altitude of less than 500 feet. . . .
> Commanding officers shall take steps to prevent unnecessary flying over known haunts of wildlife.

(Joint Ex. 6, Coast Guard Air Operations Manual 4-54, 4-55).  The manual's "specific restrictions" deal only with avoiding fur and poultry farms, resorts, and wildlife areas.  No mention of horse farms or stables is made.

Finally, Smith Kalita refuted Plaintiff's argument that the helicopter pilot failed to see and avoid RHS.  He testified that the well-known aviation requirement to "see and avoid" refers to pilots seeing and avoiding other aircraft and obstructions on the ground so as to prevent mid-air collisions with each other and crashes into ground obstructions.  See, e.g., Nakajima v. United States, 965 F.2d 987, 989 (11th Cir. 1992) (referencing the duty to see and avoid other aircraft).  The phrase does not, as Plaintiffs urge upon the Court, mean that pilots at permissible altitudes have a duty to constantly scan the ground over which they are flying to avoid horse stables, dairy farms, llama farms, and the like.  Consequently, Lt. Cdr. Baravik, flying at an appropriate altitude, did not need to be constantly scanning the ground below him to see what he should avoid flying over next.

In sum, Mary Mickalich was not injured by the breach of a duty by the Coast Guard's helicopter pilot.  Mary Mickalich chose to ride on a horse, an undertaking the Michigan Legislature recognizes as involving "an inherent risk" because of the "unpredictability of an equine's reaction to things such as sounds . . . or unfamiliar objects."  Mich. Comp. Laws § 691.1662 (2000).  The Michigan Equine Liability Act ensures that a "person" cannot be

24

held strictly liable for the injury of anyone riding a horse when the injury stems from an "inherent risk of equine activity" such as the horse's unpredictable and unfavorable reaction to the helicopter's sound and presence. See Mich. Stat. Ann. §§ 691.1661-667 (Michie 2000); Cole v. Ladbroke Racing Michigan, Inc., 614 N.W.2d 169, 172, 175 (Mich. Ct. App. 2000) (rider injured when horse spooked by a kite in a tree); Amburgey v. Sauder, 605 N.W.2d 84, 89 (Mich. Ct. App. 1999) (recognizing that horses "may behave in a way that will result in injury and that equines may have unpredictable reactions to diverse circumstances"); see also Mounts v. Vanbeeste, No. 243155, 2004 WL 1737676, at *3 (Mich. Ct. App. Aug. 3, 2004) (unpublished opinion) (finding that the "fact that a horse may buck constitutes one of the inherent risks of equine activity").

In light of the court's finding, the Court does not address damages for Mary Mickalich or her husband's contingent and derivative loss of consortium claim. See Sierocki v. Hieber, 425 N.W.2d 477, 478 (Mich. Ct. App. 1988) (breach of duty is essential element of negligence claim); Kahn v. Burman, 673 F. Supp. 210, 217 (E.D. Mich. 1987); Auto Club Ins. Ass'n v. Hardiman, 579 N.W.2d 115, 117 (Mich. Ct. App. 1998).

Albert Mickalich's claim for negligent infliction of emotional distress (based on bystander liability), which is a separate and independent cause of action, likewise fails. Although the claim is not dependent upon actual injury to, or recovery by, his wife, Hardiman, 579 N.W.2d at 117, two bases support the Court's conclusion. First, the United States' waiver of sovereign immunity requires that he prove the Coast Guard caused his injury by some breach of a standard of care. See 28 U.S.C. § 1346(b)(1) (2000) (waiving the United States' sovereign immunity only in cases involving "negligent or wrongful act[s] or omission[s]"); Laird v. Nelms, 406 U.S. 797, 799 (1972) (FTCA requires negligence be proven). Second, even if he could prove the breach of a standard of care, Mr. Mickalich cannot satisfy all the elements of a negligent infliction of emotional distress claim premised on bystander liability. To succeed, he must prove:

25

> (1) the injury threatened or inflicted on the third person must be a serious one, of a nature to cause severe mental disturbance to the plaintiff; (2) the *shock must result in actual physical harm*; (3) the plaintiff must be a member of the immediate family, or at least a parent, child, husband or wife, and (4) the plaintiff must actually be present at the time of the accident or at least suffer shock 'fairly contemporaneous' with the accident.

Wargelin v. Sisters of Mercy Health Corp., 385 N.W.2d 732, 735 (Mich. Ct. App. 1986) (emphasis added); see also Maldonado v. National Acme Co., 73 F.3d 642, 645 (6th Cir. 1996); Gustafson v. Faris, 241 N.W.2d 208, 211 (Mich. Ct. App. 1976).

Albert Mickalich has not established that he suffered any actual physical harm from the shock of watching the incident unfold. Although he recounted that the stress and anxiety of testifying at his deposition and at trial triggered pain from his preexisting gout condition, this condition was neither caused nor aggravated by the mental shock of seeing his wife fall from her horse. He testified to no other physical condition allegedly resulting from the mental shock of seeing his wife fall from her horse. As a result, he cannot satisfy the second element of this cause of action.

## IV.  CONCLUSION

The United States breached no duty owed to Plaintiffs in this matter. Accordingly, the Court enters judgment for the United States.

**IT IS SO ORDERED.**


s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

26

DATE: <u>April 5, 2007</u>

## CERTIFICATE OF SERVICE

A copy of this Order were e-filed and/or mailed to counsel of record on this date.

<u>s/Bernadette M. Thebolt</u>
Deputy Clerk